UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DAVID TAYLOR,

                Plaintiff,

    - against -

ARIELA-ALPHA INTERNATIONAL, LLC,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

07 CV 7395

COMPLAINT

JUDGE SPRIZZO

PLAINTIFF REQUESTS A TRIAL BY JURY



       Plaintiff David Taylor ("Taylor" or "plaintiff") complains of defendant Ariela-Alpha International, LLC ("AAI" or "defendant") as follows:

### NATURE OF THIS ACTION

       1.    Plaintiff brings this diversity action against defendant for a declaratory judgment of the invalidity of his non-competition agreement with AAI and to remedy AAI's interference with his business relations. In particular, defendant, relying on unenforceable provisions of a non-competition agreement, has used improper means to cause Warnaco, Inc. ("Warnaco") to terminate its employment agreement with plaintiff. AAI has also declared its intention to interfere with other prospective business opportunities of plaintiff. Plaintiff therefore seeks a declaration of the invalidity of the non-competition agreement, preliminary and permanent injunctive relief, compensatory and punitive damages, and other appropriate legal and equitable relief.

246757 v1

## JURISDICTION AND VENUE

2. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Taylor is a citizen of the State of Connecticut and from September 2005 until April 25, 2007 was the Vice President of Sourcing and Manufacturing for AAI. AAI is a limited liability company that is organized under the laws of New York and has its principal place of business in New York, New York. The value of the matter in controversy exclusive of interest exceeds $75,000.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

## PARTIES

4. Taylor has worked in the intimate apparel business for approximately 20 years. Beginning on June 18, 2007, he was Director of Technical Designs at Warnaco until July 26, 2007 when, as a result of AAI's tortious interference with his employment, he was dismissed.

5. AAI is a company that is engaged in the business of designing and manufacturing women's intimate apparel.

## FACTS

### Background

6. From 1987 to 1997, Taylor, who has a background in engineering, worked as the Manager of Pre-production Engineering for NCC Industries/Maidenform, an intimate apparel maker. He was responsible for costing and pre-production engineering. From 1997 through 2001, he held a variety of positions in companies that produced intimate apparel for Bali, Playtex, and Ralph Lauren Intimates. Among his duties were coordinating design

functions, and finding and negotiating with companies in Asia to obtain appropriate production, quality, and pricing.

### Taylor's History at AAI

7. In January 2002, AAI hired Taylor as Director of Engineering responsible for coordinating all of its design functions, including pattern making, sewing, and working with manufacturers. He reported directly to the owner of the company, Ariela Balk. As a condition of his employment at AAI, Taylor signed a non-competition agreement (the "2002 Agreement") that provided in relevant part:

> In consideration for your employment by the Company, during the term of such employment and for a period of one (1) year ("Restricted Period") after the termination or expiration of your employment by the company you will not, directly or indirectly, whether for compensation or not, and whether as principal or agent, officer, director, employee, consultant or otherwise, alone or in association with any other persons, manufacture, represent, sell, or in any way deal in or with products, product lines, suppliers or factories that are manufactured, sold, or represented by the Company, or that copy, imitate or could in any way be confused or compete with the same. If you are in any doubt as to whether any specific products, lines, suppliers of factories that are covered by this restriction at the time of termination of your employment, you shall so-advise the company and the Company will make a determination.

(2002 Agreement ¶ 8) Excepted from that restriction by a handwritten footnote were "Vogue and any Company that [Taylor] previously worked with or brought to [AAI]." (A copy of the 2002 Agreement is attached as Exhibit A.)

8. Taylor worked for AAI until June 2004 when he left for a position as Engineering Manager at Victoria's Secret with responsibility for supervising all pre-production activities for sleepwear. Six months later, he was promoted to Manager of Victoria Secret's "Non-Launch" line of intimate apparel and performed the same functions for sleepwear and

intimate apparel that he had performed at AAI. In both positions, Taylor had significant responsibility for recommending Asia-based manufacturers for the garments. AAI made no claim that Taylor would disclose AAI's trade secrets or other confidential information, or that he was otherwise precluded from working at Victoria's Secret.

9. In September 2005, AAI recruited Taylor to return and shortly thereafter promoted him to Vice President of Manufacturing and Sourcing Worldwide. AAI again required Taylor to sign a non-competition agreement (the "2005 Agreement") whose restrictive language was the same as that of the 2002 Agreement. (A copy of the 2005 Agreement is attached as Exhibit B.) As Vice President of Manufacturing and Sourcing at AAI, Taylor was responsible for working with factories and material suppliers to provide on time delivery and quality production of intimate apparel. In this position, Taylor reported to Mendel Balk, the Executive Vice President of AAI.

10. As Vice President of Manufacturing and Sourcing Worldwide, Taylor made frequent trips to Asia to contract with and monitor AAI's suppliers. Information about AAI's fabric and manufacturing sources is not confidential nor do the sources do business exclusively with AAI.

11. In March 2007, Taylor spoke with Ariela and Mendel Balk and explained that the constant travel required for the job was taking a toll on him and his family. After many discussions, Taylor and AAI management agreed that it made sense for Taylor to leave AAI. In the course of discussions about the terms of Taylor's departure, Taylor asked whether AAI intended to enforce the non-competition agreement that all AAI employees are required to sign as a condition of their employment. Ariela Balk told Taylor that she intended to enforce the non-competition agreement. Taylor took Ariela Balk's statements into consideration during his

subsequent job search and looked without success for a job outside the intimate apparel field. Ultimately he took a position at Warnaco that did not implicate his non-competition agreement.

### Source Information in the Intimate Apparel Industry

12. Nearly all fabric for low cost intimate apparel and the garments themselves are manufactured in Asia.

13. The identity of fabric and clothing factories in Asia is widely known throughout the intimate apparel industry and is often shared at trade shows, on the internet, and by brokers that represent factories. Virtually all countries that engage in such manufacturing, like China or Bangladesh, provide businesses with a directory of factories that can produce particular types of clothing.

14. Frequent visits to Asian factories are a significant part of any job involving manufacturing in the intimate apparel industry. Visitors to such factories can identify the United States companies for which the factories are producing garments.

### Taylor's Brief Tenure at Warnaco

15. On June 18, 2007, Taylor began work as Director of Technical Design at Warnaco. In that position, Taylor was responsible for adapting sample bras, which are created in a single size, to all other bra sizes. Taylor was responsible for overseeing the technical aspects of bra design, including supervising employees who make patterns, employees who sew sample garments, and employees who develop product specifications for Warnaco's manufacturing office.

16. As Director of Technical Design, at Warnaco, Taylor did not choose fabrics or select suppliers. Although the Director of Technical Design position was a lower level position than his job at AAI, Taylor was interested in the Warnaco position because it would

enable him to focus on design, rather than manufacturing and sourcing. The offer also came at an opportune time – just before the intimate apparel industry began to downsize.

### AAI's Tortious Interference With Taylor's Employment

17. On July 26, 2007, Taylor received a letter dated July 25, 2007 from counsel for defendant. That letter stated that AAI believed that by accepting the position of Director of Technical Design at Warnaco, Taylor had violated the 2005 Agreement. The letter demanded that Taylor "cease and desist" any activities that violated the non-competition agreement, and told him that if he did not do so, AAI would take legal action.

18. AAI also sent letters to Warnaco that implied that AAI would sue Warnaco if it continued to employ Taylor.

19. On or about July 28, 2008, Taylor was called into a meeting with Margaret Breslin ("Breslin"), his supervisor at Warnaco, and Jill Katz ("Katz"), Director of Human Resources for Warnaco. Breslin and Katz told Taylor that some of Warnaco's officers had received letters from AAI concerning his employment with Warnaco, and the AAI non-competition agreement. Breslin and Katz told Taylor that he would have to leave the employment of Warnaco immediately.

20. Taylor did not violate the terms of his restrictive covenant with AAI. The duties of the position Taylor held at AAI were completely different from the work he performed at Warnaco. At AAI, Taylor was responsible for the production of merchandise. Taylor accomplished his job by working with suppliers and manufacturers. At Warnaco, Taylor was responsible for the technical aspects of the design of intimate apparel. He did not source suppliers and manufacturers and was not involved in the manufacturers' costing or pricing of materials or garments.

21. Moreover, the suppliers used by AAI and Warnaco, the goods that they produce, and the markets to which the companies cater are very different. These differences are due in large part to the different prices that retailers charge for goods that AAI and Warnaco produce.

22. Wal-Mart is a major customer of AAI. The retail price for an AAI bra at Wal-Mart is no greater than $14.99. The retail price for most Warnaco bras, however, is approximately $32.00 to $54.00. Given the difference in the retail costs of these brands, any information related to AAI's pricing systems is not relevant to Warnaco's business. Information concerning AAI's fabric and sewing sources is also not important to Warnaco's business because Warnaco uses more expensive sources and passes the cost on to its retailer customers.

23. Prior to June 2007 and after 20 years in the intimate apparel business, Taylor had never been accused of divulging trade secrets or other proprietary information.

### AAI's Sporadic Enforcement of the Non-Competition Agreement

24. AAI only occasionally enforces the non-competition agreements that it requires its employees to sign. For example, Robert McGhie ("McGhie"), who was AAI's Director of Sourcing and Manufacturing before Taylor held that position, left in 2005 to take a similar job at JC Penney. AAI subsequently received a number of calls advising them that McGhie was using his AAI contacts for his work at JC Penney, and that the factories that supplied AAI were confused about who actually employed McGhie. Taylor discussed these calls with Mendel Balk. Nevertheless, AAI took no legal action against McGhie, and never threatened such action. Ariela Balk merely spoke to one of her contacts at JC Penney to express her displeasure about the situation.

25.     Similarly, AAI did not seek to enforce the non-competition agreement of John Riccardi ("Riccardi"), a Grader who conformed garment patterns for AAI and knew the factories that supplied AAI. Riccardi left AAI to work at Vanity Fair, another company producing intimate apparel. AAI also did not enforce the non-competition agreement of Aaron Grenier ("Grenier") who, as a Specification Technician, knew the materials and contractors that AAI used. Grenier left AAI for a position at Avenue, another intimate apparel company.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

(a)     declare that the 2005 Agreement is invalid under New York Law and that AAI has tortiously interfered with Taylor's business opportunities;

(b)     enjoin AAI from further interference with plaintiff's business opportunities including but not limited to his work at Warnaco;

(c)     direct defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering and interest thereon in an amount to be determined;

(d)     direct defendant to pay plaintiff punitive damages in an amount to be determined;

(e)     direct defendant to pay plaintiff the costs of this action, together with reasonable attorneys' fees; and

    (f)  award plaintiff such additional relief as the Court may deem just and proper.

Dated: New York, New York
   August 20, 2007

                VLADECK, WALDMAN, ELIAS
                & ENGELHARD, P.C.

         By: _/s/ Debra L. Raskin_
                Debra L. Raskin (DR 5431)
                Attorney for Plaintiff
                1501 Broadway, Suite 800
                New York, NY 10036
                (212) 403-7300

# EXHIBIT A

242535 v1

# ARIELA-ALPHA INTERNATIONAL LLC

# 180 MADISON AVENUE

# NEW YORK, NEW YORK 10016

## 212-683-4131

DATE  11/28/01

NAME  David Taylor
ADDRESS  210 New Canaan Ave
         Norwalk, CT 06850

Dear Mr. Taylor:

This letter will confirm our agreement regarding the terms on which you will be employed by Ariela-Alpha International, LLC (together with its affiliates, the "Company").

1.     The Company employs you as a Director of Engineering, commencing on or about 1/2/02. In such capacity, you shall perform such duties as the Company may assign to you. Your initial base salary will be $105,000 per year, plus such other benefits such as vacation and health insurance as the Company may, in its sole discretion, provide to employees generally. It is the Company's current policy to conduct performance reviews on or about December 31st of each year and to review salaries at that time.

2.     You shall at all times be an employee "at will." Subject to the requirements of law regarding anti-discrimination and equal employment opportunity, your employment may be terminated by the Company at any time, for any reason, and on such terms as the Company may consider appropriate. Similarly, you may terminate your employment with the Company at any time and for any reason.

3.     You shall at all times during the period of your employment with the Company devote your full and exclusive time and attention to the discharge of your duties. You may not engage in any other form of employment, consulting or other type of work without the prior written permission of the Company to do so.

4.     You shall make no representations or warranties regarding the Company's products or services, except as may have been specifically approved by the Company.

5.     During the course of your employment by the Company you will have access to, and become familiar with, various trade secrets and confidential information which belongs and is of vital economic importance to the Company, including, but not limited to, documents and other information regarding (a) the Company's sales methods, pricing and costs (b) the Company's suppliers and manufacturers and their methods, processes and pricing, (c) the identity, location,

and service requirements of the Company's customers and the prices charged to them by the Company, and (d) the Company's business, product and design plans and strategies (all of the foregoing, "Confidential Information"). You have agreed (a) that all Confidential Information shall be highly confidential and constitute trade secrets, and (b) that all of the Confidential Information shall continue to be owned solely by the Company. During the term of your employment and after such employment terminates for any reason, you shall not use, communicate, reveal or otherwise make available Confidential Information for any purpose whatsoever, or divulge such information to any person or entity other than the Company or persons expressly designated by the Company, unless you are compelled to do so by subpoena or other judicial process.

6. Under no circumstances shall you remove from the Company's office without the Company's prior written consent any books, records, documents, designs, samples or customer lists belonging to the Company, or any copies of such documents, whether in paper, electronic or other form (collectively, "Company Records"). Following the termination of your employment with the Company for any reason you shall promptly return to the Company all Company Records as are then in or may thereafter come into your possession or under your control. If you are in any doubt as to whether a specific thing is a Company Record at the time of termination of your employment, you shall so-advise the Company and the Company will make a determination.

7. The Company shall be the sole owner of all the products and proceeds of your services to the Company, including, but not limited to, all materials, ideas, concepts, designs, samples, customer relationships, formats, suggestions, developments, arrangements, packages, programs and other intellectual properties that you may acquire, obtain, develop or create in connection with and during the term of your employment. You shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain or defend its right, title and interest in or to any such properties.

8. In consideration for your employment by the Company, during the term of such employment and for a period of one (1) year ("Restricted Period") after the termination or expiration of your employment by Company you will not, directly or indirectly, whether for compensation or not, and whether as principal or agent, officer, director, employee, consultant or otherwise, alone or in association with any other person, manufacture, represent, sell, or in any way deal in or with products, product lines, suppliers or factories that are manufactured, sold, or represented by the Company, or that copy, imitate or could in any way be confused or compete with the same.*  If you are in any doubt as to whether any specific products, lines, suppliers or factories that are covered by this restriction at the time of termination of your employment, you shall so-advise the Company and the Company will make a determination.

Furthermore, you shall not solicit or induce, or attempt to solicit or induce, any employee or agent or consultant of the Company to leave his or her employment or terminate his or her consultation agreement or relationship with the Company.

*Except for Vogue and any company that I have previously worked with or bring to this company

9.  In the event of a breach or threatened breach by you of the covenants and restrictions contained in the foregoing paragraphs 5 through 8, the Company shall be entitled to seek injunctive relief enforcing them. However, nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it.

10.  At the time of termination of your employment, you and a representative designated by the Company will conduct an exit interview at which you will specify any obligations that you may then believe the Company my have to you and any claims that you then believe you may have against the Company.

11.  If any court determines that any of the restrictive covenants contained in this agreement are unenforceable because of their scope, such court shall have the power to reduce the scope of such provisions, and, in their reduced form, such provisions shall then be enforceable.

12.  This agreement shall be governed by the internal laws of the State of New York without giving effect to principles of conflicts of law. You irrevocably submit to the jurisdiction of any state or federal court sitting in the State of New York, County of New York, in any action arising out of or relating to this agreement, provided that nothing contained in this paragraph shall affect the Company's right to bring any action in courts of other jurisdictions or venues.

13.  This agreement supersedes all other agreements and understandings between us and sets forth our complete agreement with respect to your employment. Neither of us relies on any representations, conditions or agreements, oral or written, express or implied, except as expressly set forth in this agreement. No modification or amendment of this agreement shall be effective unless in writing and executed by both of us. No delay or failure by either of us to exercise any right under this agreement shall constitute a waiver of that or any other right.

Very truly yours,

Ariela-Alpha International LLC


By:_____


I agree to the foregoing. I acknowledge that prior to executing this agreement, I have had the opportunity to consult with and be advised by legal counsel. I acknowledge that I have not been advised by counsel for the Company.

*David J Dy* (signature)
[Employee]

# EXHIBIT B

242535 v1

# ARIELA-ALPHA INTERNATIONAL LLC
# 19 WEST 34TH STREET
# NEW YORK, NEW YORK 10001
# 212-683-4131

DATE __8-3-05__

NAME __DAVID TAYLOR__

ADDRESS _____

_____

Dear __DAVID__:

This letter will confirm our agreement regarding the terms on which you will be employed by Ariela-Alpha International, LLC (together with its affiliates, the "Company").

1.    The Company employs you as a __SR Director of Global MNFG + Sourcing__ commencing on or about __9/7/05__. In such capacity, you shall perform such duties as the Company may assign to you. Your initial base salary will be $__200,000__ per year, plus such other benefits such as vacation and health insurance as the Company may, in its sole discretion, provide to employees generally. It is the Company's current policy to conduct performance reviews on or about December 31st of each year and to review salaries at that time. __3 weeks vacation__   __MB 9/8/05__

2.    You shall at all times be an employee "at will". Subject to the requirements of law regarding anti-discrimination and equal employment opportunity, your employment may be terminated by the Company at any time, for any reason, and on such terms as the Company may consider appropriate. Similarly, you may terminate your employment with the Company at any time and for any reason.

3.    You shall at all times during the period of your employment with the Company devote your full and exclusive time and attention to the discharge of your duties. You may not engage in any other form of employment, consulting or other type of work without prior written permission of the Company to do so.

4.    You shall make no representations or warranties regarding the Company's products or Services, except as may have been specifically approved by the Company.

5.    During the course of your employment by the Company you will have access to, and become familiar with, various trade secrets and confidential information which belongs and is of vital economic importance to the Company, including, but not limited to, documents and other information regarding (a) the Company's sales methods, pricing and costs (b) the Company's

suppliers and manufacturers and their methods, processes and pricing, (c) the identity, location, and service requirements of the Company's customers and the prices charged to them by the Company, and (d) the Company's business, product and design plans and strategies (all of the Foregoing, "Confidential Information"). You have agreed (a) that all Confidential Information Shall be highly confidential and constitute trade secrets, and (b) that all of the Confidential Information shall continue to be owned solely by the Company. During the term of your employment and after such employment terminates for any reason, you shall not use, communicate, reveal or otherwise make available Confidential Information for any purpose whatsoever, or divulge such information to any person or entity other than the Company or persons expressly designated by the Company, unless you are compelled to do so by subpoena or other judicial process.

6. Under no circumstances shall you remove from the Company's office without the Company's prior written consent any books, records, documents, designs, samples or customer lists belonging to the Company, or any copies of such documents, whether in paper, electronic or other form (collectively, "Company Records"). Following the termination of your employment with the Company for any reason you shall promptly return to the Company all Company Records as are then in or may thereafter come into possession or under your control. If you are in any doubt as to whether a specific thing is a Company Record at the time of termination of your employment, you shall so-advise the Company and the Company will make a determination.

7. The Company shall be the sole owner of all the products and proceeds of your services to the Company, including, but not limited to, all materials, ideas, concepts, designs, samples, customer relationships, formats, suggestions, developments, arrangements, packages, programs and other intellectual properties that you may acquire, obtain, develop or create in connection with and during the term of your employment. You shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain or defend its right, title and interest in or to any such properties.

8. In consideration for your employment by the Company, during the term of such employment and for a period of one (1) year ("Restricted Period") after the termination or expiration of your employment by Company you will not, directly or indirectly, whether for compensation or not, and whether as principal or agent, officer, director, employee, consultant or otherwise, alone or in association with any other person, manufacture, represent, sell, or in any way deal in or with products, product lines, suppliers or factories that are manufactured, sold, or represented by the Company, or that copy, imitate or could in any way be confused or compete with the same. If you are in any doubt as to whether any specific products, lines, suppliers or factories that are covered by this restriction at the time of termination of your employment, you shall so-advise the Company and the Company will make a determination.

Furthermore, you shall not solicit or induce, or attempt to solicit or induce, any employee or Agent or consultant of the Company to leave his or her employment or terminate his or her Consultation agreement or relationship with the Company.

9. In the event of a breach or threatened breach by you of the covenants and restrictions contained in the foregoing paragraphs 5 through 8, the Company shall be entitled to seek injunctive relief enforcing them. However, nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it.

10. At the time of termination of your employment, you and a representative designated by the Company will conduct an exit interview at which you will specify any obligations that you may then believe the Company may have to you and any claims that you then believe you may have against the Company.

11. If any court determines that any of the restrictive covenants contained in this agreement are unenforceable because of their scope, such court shall have the power to reduce the scope of such provisions, and, in their reduced form, such provisions shall then be enforceable.

12. This agreement shall be governed by the internal laws of the State of New York without giving effect to principles of conflicts of law. You irrevocably submit to the jurisdiction of any state or federal court sitting in the State of New York, County of New York, in any action arising out of or relating to this agreement, provided that nothing contained in this paragraph shall affect the Company's right to bring any action in courts of other jurisdiction or venues.

13. This agreement supercedes all other agreements and understandings between us and sets forth our complete agreement with respect to your employment. Neither of us relies on any representations, conditions or agreements, oral or written, express or implied, except as expressly set forth in this agreement. No modification or amendment of this agreement shall be effective unless in writing and executed by both of us. No delay or failure by either of us to exercise any right under this agreement shall constitute a waiver of that or any other right.

Very truly yours,

Ariela-Alpha International LLC

By: _____ 9/8/05

I agree to the foregoing. I acknowledge that prior to executing this agreement, I have had the Opportunity to consult with and be advised by legal counsel. I acknowledge that I have not been advised by counsel for the Company.

_____
[Employee]